**UNITED STATES of America, Plaintiff,**

v.

**UNITED STATES CURRENCY: $24,927, Defendant.**

No. C–3–82–439.

United States District Court, S.D. Ohio, W.D.

Feb. 24, 1986.

James A. Wilson, Asst. U.S. Atty., Dayton, Ohio, for plaintiff.

Daniel R. Rutherford, Atty. at Law, San Antonio, Texas, for defendant.

DECISION AND ENTRY SUSTAINING PLAINTIFF'S MOTION FOR PROMPT DISPOSITION OF FORFEITURE (DOC. #15); TERMINATION ENTRY

RICE, District Judge.

This matter comes before the Court for resolution of the Government's Motion for Prompt Disposition of Forfeiture (Doc. #15). The case arises out of a search by federal and state law enforcement officials on May 13, 1982, pursuant to a federal search warrant, of claimant Thomas Kahelin's residence in or near Cedarville, Ohio. (Tr. 417).[1] Among the items seized during that search of Kahelin's premises was $24,927 in United States currency, which is the subject of the Government's pursuit of forfeiture herein pursuant to 21 U.S.C. § 881(a)(6).

An indictment alleging narcotics violations was returned against Thomas Kahelin on October 26, 1982. The instant case was then stayed pending resolution of the criminal case. After trial to a jury in this Court, Kahelin was convicted on three counts of violations of the federal narcotics laws, including conspiracy, possession within intent to distribute and distribution of cocaine and marijuana. *United States v. Thomas Kahelin*, CR-3-82-44(33) (S.D.Ohio April 5, 1984). These convictions were upheld on appeal. 779 F.2d 53 (6th Cir.1985). Upon the resolution of the criminal case, briefs were ordered by this Court in the instant forfeiture proceeding. Both the Government and claimant Thomas Kahelin have indicated in their briefs that no additional hearing is necessary on the issue of forfeiture, and both have relied upon the transcript of the evidence adduced in Kahelin's criminal trial.

(A) *Facts*

The parties present differing versions of the facts in their briefs. The Government relies on the trial testimony of three federal Drug Enforcement Agency (DEA) agents and on the testimony of Robert Terry, a co-conspirator of Kahelin's who pled guilty to certain charges in the indictment and who testified against Kahelin in the criminal trial. Stephen White, a DEA agent, testified at Kahelin's trial that he had approached Robert Terry, through an informant, to make the purchase of cocaine from Terry. (Tr. 264–265). After making a phone call, Terry informed White that he had a source for one ounce of cocaine. (Tr. 266). White, Terry and the informant then drove in White's vehicle to or near Cedarville, Ohio. (Tr. 267). On route to Cedarville, Terry told White that the source of his cocaine was affluent, that he (the source) derived income from gambling, that he had an interest in horses and that he obtained his drugs in El Paso, Texas. (Tr. 271–272, 278).

Upon reaching Cedarville, White and the informant waited in a restaurant while Terry proceeded alone in White's vehicle. Terry returned twenty minutes later with an ounce of cocaine in a clear plastic heat-sealed bag. (Tr. 273, 276, 431). White gave Terry $2,200 of DEA funds, the serial numbers of which had been recorded by the DEA. (Tr. 274–276). While White and the informant waited at another restaurant, Terry proceeded in White's vehicle to take the $2,200 payment to his source for the cocaine. (Tr. 274). When Terry returned to the restaurant, he showed White and the informant approximately two pounds of marijuana, which he stated that he had also gotten from his source. *Id.*

Two other DEA agents were conducting surveillance of the encounter on May 10, 1982 between the informant, DEA agent White and Robert Terry. DEA agent Bill Modesitt, using an airplane, observed the above-described trip to Cedarville by the informant, White, and Terry. (Tr. 293–295). Modesitt observed two persons exit from White's vehicle upon reaching Cedarville, and then observed White's vehicle

1. Transcript references are to the transcript of the underlying criminal trial, *United States v.* *Thomas Kahelin,* CR-3-82-44(33).

proceed to a big home with barns on Dean Road in or near Cedarville and saw the driver of the vehicle enter the house. (Tr. 295–296). Modesitt then observed White's vehicle depart the house on Dean Road and drive to Cedarville, that the driver exited the vehicle, talked with two other individuals, and that the vehicle then returned to the same residence on Dean Road. (Tr. 296–297). DEA agent Richard Stuart also testified at trial that he observed White, Terry and the informant on the day in question. Stuart was in an automobile observing said parties' meeting at Robert Terry's residence in Brandt, Ohio, their departure from said residence, and their return later that afternoon. (Tr. 415).

At Kahelin's criminal trial, Robert Terry testified that from 1980 through May, 1982, Terry would buy twenty to thirty pounds of marijuana every other week from Kahelin, picking the marijuana up from Kahelin's residence on Dean Road in or near Cedarville. (Tr. 323–326). The arrangement described by Terry was that Kahelin "fronted" marijuana to Terry, meaning that Terry would pick up the marijuana, sell it, and return the proceeds to Kahelin after sale. *Id.* Both Terry and Kahelin kept their own records of the marijuana dealings between them and the sums owed by Terry to Kahelin for the marijuana "fronted" by Kahelin. (Tr. 332–33). Terry testified that he had no other business relationship with Thomas Kahelin, that he would owe Kahelin large sums of money at various times for marijuana, and that at one time his debt to Kahelin amounted to $49,580. (Tr. 333–334). Terry also corroborated the version of the events on May 10, 1982, involving the cocaine purchased by DEA agent White, which the federal agents have provided at trial. (Tr. 335–338).

After Agent White obtained the cocaine from Terry, DEA agent Stuart obtained a federal search warrant for Kahelin's residence and premises on Dean Road near Cedarville, Ohio. (Tr. 417). Kahelin was present when the search warrant was executed by federal and state officials on May 13, 1982. (Tr. 417–418). Kahelin directed the agent's attention to several shotguns or rifles on the first floor. (Tr. 419). In a second floor bedroom, a steel suitcase was found, and Kahelin told Agent Stuart the combination of said suitcase. Among the more notable items found inside the suitcase were a large amount of U.S. currency, and a .38 caliber revolver in a holster. (Tr. 419). The U.S. currency totalled $24,927, $2,000 of which were the same marked bills that White had given to Terry in payment for cocaine on May 10, 1982. (Tr. 420).

According to Agent Stuart, further search of the Kahelin home and premises turned up marijuana in several locations in clear plastic bags (Tr. 421–22, 431, 432), and cocaine in a small metal container inside a clear plastic bag. Approximately twenty-five pounds of marijuana, in one or two pound packages, was found inside an old automobile in a detached garage on the Kahelin premises. (Tr. 422, 435, 451). Agent Stuart testified that two scales, both of a variety commonly used in the narcotics business, were found on the Kahelin premises. (Tr. 426, 436, 453). Plastic bags identical in nature to the bag containing the cocaine sold by Terry to White, and an electric heat sealer, often used to seal plastic bags in which drugs are placed, were also found on the Kahelin premises. (Tr. 427–28, 436, 454). Written records, which Agent Stuart testified were typical of records kept by narcotics dealers, were found throughout the house. (Tr. 422, 427). Among the records found was a folder reflecting transactions with Robert Terry, transactions and records testified to by Agent Stuart as reflecting the marijuana transactions between Kahelin and Terry. (Tr. 437–438).

On claimant Kahelin's version of the facts, Robert Terry came to his residence on May 10, 1982 in order to repay part of a loan which Terry owed to Kahelin. (Tr. 660). Kahelin's position is that he did not meet Terry until September, 1981. Kahelin denies that he had any drug dealings with Robert Terry or anyone else, specifically denying that he "fronted" marijuana to Robert Terry for the period testified to by Terry and that he otherwise participated in

the sale or distribution of drugs. (Tr. 672–673, 682). In his brief, Kahelin focuses upon the lack of any direct observation by the DEA agent of the claimed drug transaction on May 10, 1982, between he (Kahelin) and Terry. (Doc. # 17 at 13).

While claimant Kahelin provides a different version of the actual conduct of the federal and state agents' search of his residence, he does not dispute that the items enumerated above were found on his premises during the search. With respect to currency found in the suitcase, Kahelin testified that he was in the horse business, the wholesale antique business, and that he bought and sold gold and silver. (Tr. 635). He testified that he had rented or resold three or four homes, that his wife operated an antique store, and that he had earned as much as $11,000 in gambling and that he had reported those winnings on his federal income tax forms. (Tr. 638, 640, 642, 694). Kahelin testified that his possession of $22,927 in unmarked money in the suitcase was understandable given the cash demand of his various businesses. (Tr. 643–644). Kahelin thus explains in his brief (Doc. # 17 at 8) that it was logical that Kahelin would have placed the "marked money" that Terry gave him in partial payment for a loan with the $22,927 of legitimate funds which he had on hand.

With respect to the remaining items, enumerated *supra,* which were found on his premises during the search, Kahelin testified that the small amounts found in the house were his own for personal use, and that he had no idea how the cocaine or twenty-five pounds of marijuana in the garage came to be on his premises. (Tr. 670–672, 685). The seized records, claimant explained, were actually records concerning his legitimate businesses. (Tr. 654–655). Kahelin said that he recognized one of the scales, as it was used in his gold and silver business, but denied knowledge of the other. (Tr. 648). The heat sealer and the plastic bags he believed to be the property of his wife. (Tr. 669–670, 685). Kahelin testified that in 1978 his reportable income was approximately $22,000 and that

thereafter it was below $25,000. (Tr. 694–695).

(B) *Legal Analysis*

■ In a proceeding pursuant to 21 U.S.C. § 881(a)(6) for forfeiture of things of value furnished in exchange for a controlled substance, the burden of proof is the same as that applicable under 19 U.S.C. § 1615 to forfeiture under the custom laws. The Government has the burden of showing probable cause that the currency at issue in this case was furnished in exchange for a controlled substance. *U.S. v. Fifty Thousand Dollars ($50,000) U.S. Currency,* 757 F.2d 103, 105 (6th Cir.1985). The probable cause which the Government must show is "a reasonable ground for belief of guilt, supported by less than *prima facie* proof but more than mere suspicion." *U.S. v. $22,287, U.S. Currency,* 709 F.2d 442, 446–447 (6th Cir.1983). In making its probable cause showing, the Government must also establish a nexus "between the property to be forfeited and the criminal activity defined by statute," that being the exchange of a controlled substance. *Id.* at 447. Circumstantial evidence of drug transactions is sufficient to support the establishment of probable cause in the forfeiture proceeding. *United States v. Brock,* 747 F.2d 761, 763 (D.C.Cir.1984); *United States v. $93,685.61 in U.S. Currency,* 730 F.2d 571, 572 (9th Cir.1984); *United States v. $364,960 in U.S. Currency,* 661 F.2d 319, 324 (5th Cir.1981).

■ If the Government meets its burden of showing probable cause, the burden then shifts to claimant Kahelin to show by a preponderance of the evidence that the currency at issue is not subject to forfeiture. The Court notes that Kahelin does not contest forfeiture of the $2,000 in marked bills which were found in the steel suitcase. (Doc. # 17 at 15). Accordingly, should the Government meet its burden, at issue would be whether the remaining $22,927 in United States currency is subject to forfeiture.

### (1) *Probable Cause*

Reference to forfeiture decisions by other courts is particularly useful in a case such as this to determine the type of evidence sufficient to establish probable cause. In *United States v. $22,287*, after arrest of the claimant for distribution of heroin, $427 was found on his person. His residence was then searched pursuant to a warrant. Currency in the amount of $21,-860 was found in the claimant's house, together with a plastic bag containing heroin, two scales, and assorted firearms. The Sixth Circuit found that the telephone conversation between the claimant and an undercover agent concerning a recent drug transaction by the claimant, plus the actual amount of currency found, the narcotics, the scales and the firearms, "abundantly supported the Government's contention that there was probable cause to institute the forfeiture proceeding as to the $22,-287." 709 F.2d at 449.

In *United States v. $364,960 in U.S. Currency*, several illegal aliens were found in the searched apartment, an apartment in which they claimed no interest, with narcotics, guns, and currency in the amount of $364,960. From the small quantities of drugs, plastic bags and scales found in the apartment, the Fifth Circuit inferred that "a larger quantity of drugs than that found was to be sold." 661 F.2d at 324. The court also stated that "from the sheer quantity of currency seized under these circumstances, a court may permissibly infer a connection with illegal narcotics trafficking." *Id.* Additional circumstantial evidence of guilt was found in the attempt to escape by two of the illegal aliens found in the apartment. Even though these individuals may have attempted to escape because of their status as illegal aliens, the Fifth Circuit felt the escape to also go toward the Government's showing of probable cause, observing "that the evidence presented would support an alternative hypothesis does not prevent it from being probative on the issue of probable cause." *Id.* Even though no actual transaction was witnessed, the Fifth Circuit concluded that there was probable cause for the belief that a substantial connection existed between the seized currency and narcotics trafficking. 661 F.2d at 325.

In *United States $2,500 in United States Currency*, 689 F.2d 10, 12 (2d Cir. 1982), *cert. den.*, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984), the search of the claimant's apartment revealed $2,500 in currency, records identified as records of drug transactions, a scale, and a quantity of cocaine. The court observed that $2,500 was a "quantity of cash ... substantially greater than is commonly kept in residential premises by law abiding wage earners." *Id.* at 16. The court observed that the claimant, prior to the search, had sold heroin to an undercover agent and had offered to provide him with more drugs. These facts, together with the records, scale, and quantity of cocaine found on the premises, were found sufficient to establish probable cause. *Id.*

Were this a case where "marked" money was simply found comingled with other currency on the searched premises, claimant might have a stronger argument against the Government's demonstration of probable cause for forfeiture. In this case, however, the Government has introduced testimony of a pattern of marijuana trafficking from 1980 through mid-1982 between claimant Kahelin and Terry. Even without this testimony, the Government has introduced overwhelming evidence of a transaction on May 10, 1982, in which Kahelin was undoubtedly the source of cocaine sold to undercover agent White. Kahelin's testimony that Terry must have obtained the drugs elsewhere, that Terry must have entered Kahelin's premises without knowledge, and that Terry merely repaid him in part for a loan with the "marked" money is simply not credible and is outweighed by the Government's evidence. The Court also cannot find credible Kahelin's testimony that he had no knowledge of the twenty-five pounds of marijuana, a quantity of drugs far larger than found in the other forfeiture cases cited,

stored in an automobile in a garage on his property.

■ A sum of $22,927 is not only more than commonly kept by wage earners, *U.S. v. $2,500,* 689 F.2d at 16, but is an amount deemed significant in itself by the Sixth Circuit when considered along with other indices of drug trafficking. *United States v. $22,287,* 709 F.2d at 449. Also found along with this currency were scales and other drug-related paraphernalia such as plastic bags and a heat sealer. Moreover, written records from the same premises reflect drug transactions, including drug transactions between Kahelin and Robert Terry, as testified to by witnesses for the Government. The Court does not find credible Kahelin's explanations either that the heat sealer found under the sofa was an appliance of his wife's, or that he was unaware of one of the scales, or that the remaining scale and the written records pertained to his antiques or other legitimate business. As noted by the Fifth Circuit, the fact that evidence presented would support an alternative hypothesis does not prevent it from being probative on the issue of probable cause. The Court believes there is considerable evidence in this case, as enumerated herein, to conclude that the Government has shown probable cause for the institution of its forfeiture proceeding.

(2) *Claimant Kahelin's Burden of Proof*

■ Once the Government has made its probable cause showing, the burden under 19 U.S.C. § 1615 shifts to the claimant to show by a preponderance of the evidence that the property involved, herein $22,927 in currency, was not furnished in exchange for a controlled substance. *United States v. $83,320 in United States Currency,* 682 F.2d 573, 577 (6th Cir.1982). Kahelin testified that he had cashed in certain of his gold and silver earnings to net the $22,927 found in the steel suitcase along with the DEA's "marked" money. (Tr. 699). Claimant also testified that the businesses in which he engaged—antiques, horses, and gold and silver dealings—required cash for their operation, thus explaining his need to keep such a very substantial amount of cash on his premises. (Tr. 644).

Having reviewed the testimony of claimant and his explanations, the Court finds them to have been far less than credible and finds that claimant simply has not sustained his burden of proving that the money found on his premises was not used in violation of the law. Claimant offered no documentary evidence of any kind in support of his claim as to the legitimate source of the $22,927, or of his assertion as to its origin in a cashing-in of gold and silver holdings. Kahelin testified at trial that he had not reported over $25,000 on his federal income tax returns from the years 1978 and years subsequent. (Tr. 694–95). Yet, claimant has purchased or has been able to obtain credit to buy such expensive items as two Mercedes Benz automobiles, other homes, a horse farm, and horses. Given the absence of any records or other documentary evidence, notwithstanding Kahelin's assertion that the written records seized in his second floor home were related to his businesses and not to his alleged drug dealings, this Court simply cannot accept that the $22,927 has been demonstrated to have come from legitimate business operations rather than in exchange for controlled substances.

In *United States v. $83,320 in United States Currency,* the claimant therein had also asserted that the cash which had been found on his premises had been generated by his legal business entity, even though that business entity had lost considerable sums in the past. The Sixth Circuit recognized that it could not be said with "absolute and positive certainty" that the currency found on the claimant's premises had not been legally generated. The Sixth Circuit nonetheless found that claimant had not carried his burden of showing that the property had not been used in violation of the law, stating that "a remote possibility does not vitiate a strong probability, and neither will it create a preponderance of evidence against a far more reasonable

conclusion." *Id.* at 577–78. This Court likewise concludes that Kahelin has not overcome, by a preponderance of the evidence, the far more reasonable conclusion that the $22,927 found in the steel suitcase was derived in illegal dealings in narcotics.

(C) *Conclusion*

For the reasons aforesaid, the Court hereby orders the amount of $24,927 in United States currency forfeited to the United States Government. Judgment is to be entered in favor of the United States.